## Graham *v.* Cummings, Appellant.

*Principal and agent—Contract—Evidence—Money had and received—Accounting—Equity—Jurisdiction.*

All profits made and advantage gained by an agent in the execution of the agency belong to the principal, and it matters not whether such profits or advantage be the result of the performance or of the violation of the duty of the agent. . If his duty be strictly performed, the resulting profit accrues to the principal as the legitimate consequence of the relation `; if profit accrues from his violation of duty, that likewise belongs to the principal, not only because the principal has to assume the responsibility of the transaction, but also because the agent cannot be permitted to derive advantage from his own default.

In an action for money had and received by the defendant for the use of the plaintiff, it appeared that the plaintiff, defendant and one other person were the sole owners of the stock of a corporation. The defendant conducted certain negotiations which resulted in a sale of the whole stock of the corporation, to be paid for in the stock of another corporation. In the negotiation the defendant secretly stipulated for a cash payment of a large sum of money to himself as part of the consideration for his own stock. From the defendant's own declarations and other facts and circumstances of the case, it was shown that he was acting in the negotiations not only for himself, but as agent for the other two owners of the stock. The defendant received the cash payment and paid no part of it to his associates. *Held,* (1) that the defendant was liable to his associates severally and not jointly ; (2) that a bill in equity for an account was not the appropriate remedy ; (3) that the action was properly brought at law for money had

and received for use of plaintiff; (4) that a verdict and judgment for plaintiff should be sustained.

A court of equity's jurisdiction over matters of account is based upon the complicated character of the account, the need of discovery, and the existence of a fiduciary or trust relation.

Where accounts are all on one side, and no discovery is sought or needed, courts of equity will not take jurisdiction of the cause.

Argued Jan. 7, 1904. Appeal, No. 90, Jan. T., 1903, by defendant, from judgment of C. P. No. 5, Phila. Co., Dec. T., 1901, No. 224, on verdict for plaintiff in case of Charles H. Graham v. John E. Cummings. Before MITCHELL, C. J., DEAN, FELL, BROWN, MESTREZAT, POTTER and THOMPSON, JJ. Affirmed.

Assumpsit commenced by attachment under act of March 17, 1869. Before DAVIS, J.

The facts are stated in the opinion of the Supreme Court.

The court charged in part as follows :

[Now, I say, the original agreement or memorandum, as you may call it, between Eaton and Cummings looked for the sale of Cummings's stock alone for the sum of $200,000, but in the agreement which is made part of this other agreement, which was executed by Synnott and Cummings as well as Eaton, there is introduced another covenant which does not appear in the first. It is as follows :

" The party of the first part further agrees that in consideration of the sum of one dollar to him in hand paid by the party of the second part, receipt of which is hereby acknowledged, the second party shall have the option to the first party's interest in the property and business of the Safe Harbor Match Company."

Now, it will be for you to say, gentlemen, and not for the court, whether the $200,000 which Mr. Cummings admittedly received in cash and for which he has rendered no account to either Mr. Graham or Mr. Synnott, was for this second consideration or for the sale of the stock. You will bear in mind that this agreement, by its terms, is written into this other agreement. This other agreement is only for the sale of stock. The consideration in this private agreement is that for the sum of $200,000 Cummings sells, assigns and transfers all his right, title and interest in the Atlantic Match Company's stock. There

is in the second covenant a new consideration in the sum of
$1.00, and it is for you to say whether that is not a separate
and entire contract apart from the sale of the National Match
Company stock ; whether the $200,000 received was or was
not for the sale of the stock or for this additional considera-
tion.] [11]

It is hardly necessary for me to go more fully into the testi-
mony, for the case has been very skilfully and very intelligently
presented to you, and you are to be commended for the patience
with which you have listened to it, but, you are to take into
consideration, before you arrive at your verdict, all of the tes-
timony.   It is your duty to analyze it, to sift it and to reach
the truth from the testimony of all the witnesses, and, having
so done, to render your verdict from the evidence entirely, and
from the evidence as it has been produced to you in the trial
of this case.

Now, something has been said in reference to the part which
Mr. Eaton played in this matter.   Nothing that Mr. Eaton did
or did not do could relieve Mr. Cummings of any liability or
impose any liability upon him.   The testimony is that Mr.
Eaton received $5,000 with some other smaller amounts from
Mr. Cummings on the day of the first payment to Mr. Cum-
mings, and that there was no duebill or any evidence of in-
debtedness taken or given at that time.   The testimony also
is that Mr. Cummings simply loaned this amount of money
and that it has all been repaid to him save, I think, the sum of
about $1,200.

As to the matter of the further consideration, you will re-
member that Mr. Cummings testified that he had worked there
without salary for over a year, and that he had built up the
plant from a valueless to a valuable one.   You will also re-
member that he was bound so to do.   You will also remember
the testimony of Mr. Synnott and the agreements, that although
he was bound to advance but $15,000, he had actually advanced
$91,000.   You will bear in mind that at the time of the con-
sultations and conferences in reference to the terms, the fact
that the $91,000 was due to Mr. Synnott was spoken of and
made a part of their conversation, but it is admitted that on no
occasion did Mr. Eaton or Mr. Cummings ever state to either
of these other gentlemen the fact that he had received or that

he would ask for $200,000 more for his portion than for theirs. These matters, I say, are all for your determination.

If you believe that Mr. Cummings acted for Mr. Synott and Mr. Graham, then the plaintiffs have a right to a verdict. If you believe that Mr. Cummings in perfect good faith was endeavoring to sell his own interest for as much as he could get and was not the agent or trustee for the others, then the plaintiff cannot recover.

As to the agreement made between Messrs. Cummings and Eaton it is for you to say, as I have said before, whether you believe the $200,000 was given for Mr. Cummings's holdings in the Atlantic Match Company or whether it was given for the option on the Safe Harbor Match Company, forming your opinion from the testimony and from the agreements, the consideration in all being the purchase and sale of the stock of the Atlantic Match Company.

If I have omitted or misquoted any of the testimony, I would ask counsel to call my attention to it.

Mr. Prichard: As I understand your honor's charge, you have said to the jury that Mr. Cummings has testified that the consideration for the $200,000 was the option to purchase the Safe Harbor Match Company. I recollect no such testimony. The only testimony in that connection, as I understand it, is that part of the consideration of the $200,000 was not simply the option to purchase, which was of little value at the end of the six months, but the much more important item to furnish the product of the Safe Harbor Match Company for six months at factory cost.

Mr. Todd: The question of the payment of the cash, as stated by Mr. Synnott, was that Mr. Cummings told him on the Tuesday following July 18 that there was no cash to be paid, but the question of the stock came up, whether he would ask for additional stock.

The Court: The jury will bear in mind the testimony, and if I am in error as to details, will correct me. The fact remains that Mr. Cummings reported to Mr. Synnott, according to his testimony, that there was no cash to be paid. That is denied by Mr. Cummings. That thereafter Mr. Synnott endeavored with Mr. Cummings to have the stock payment raised from $750,000 to $1,000,000, is not denied.

[In regard to the consideration for the $200,000, you will remember that testimony as well as the court. It may be that Mr. Prichard is correct, that the $200,000 was paid for the stock and also for the option on the Safe Harbor Match Company, also for the services he had rendered, and, as I remember his testimony, also for the purchase of the product of the Safe Harbor Match Company for six months. The jury will take that into consideration, coupled with this fact, that the option to purchase the Safe Harbor Match Company was at a price to be determined by an examination of the books, said price not to exceed the actual cash paid into said company, the option to cover a period of six months, and the parties to agree to control the balance of the stock, and also that during the period of the option the second party should have the entire output of the Safe Harbor Match factory at the factory cost. In other words he was to sell at the expiration of six months, if Mr. Eaton wanted to buy at a price not larger than the amount of the cash put in and he was to sell all his goods at factory prices, and it is for you to say whether a man could lose anything if he sold for what it cost and if he was paid the price of his manufacture and whether that could be a consideration for the payment of $200,000 under the other circumstances which are in evidence before you.] [12]

Defendant presented these points:

4. Even if all the plaintiff's evidence is believed, and even though the jury should believe the sale of the plaintiff's stock was procured by fraud or misrepresentation on the part of Cummings or by a fraudulent conspiracy between Cummings and Eaton, nevertheless plaintiff's remedy would be either by a suit to rescind the agreement or by an action for damages for the fraud. It could not be by an action for money had and received to his use, since he had no title to the money, either legal or equitable. *Answer:* Refused. [1]

6. If the plaintiff can recover in this action, it must be upon the theory of an implied assumpsit growing out of the waiver of a tort. In such case, as the alleged tort was joint, the result of the waiver of it cannot be the right to separate actions of assumpsit. *Answer:* Refused. [2]

7. Plaintiff having commenced the action by an attachment under the act of 1869, based expressly upon an alleged tort,

cannot recover in that action upon the theory that he has waived the tort and is entitled to recover for money had and received. *Answer:* Refused. [3]

10. If the sale to Eaton was a joint sale, and Cummings could be held to have acted as agent or to be in a fiduciary position, he would be agent or trustee for all the parties, and any money received by him would be for joint account, and no separate action for money had and received to his individual use could be maintained by Synnott. *Answer:* Refused. [4]

11. The fact, even if believed, that Cummings knew that Eaton had represented that the National Company would have $200,000 in cash, and had with that knowledge secretly bargained with Eaton for $200,000 cash, would at best be evidence of fraud or conspiracy, giving rise to an action for damages. It could not justify an action of assumpsit against Cummings for money had and received. *Answer:* Refused. [5]

Plaintiff presented this point:

3. If the jury find from the evidence that when the contract of July 23, 1901, which was signed by Messrs. Synnott, Cummings and Eaton, providing for the sale of the entire stock of the Atlantic Match Company for the consideration and upon the terms therein named, was so signed by them, there was in fact a private agreement between Cummings and Eaton whereby Cummings was to receive another and additional consideration for his share of the stock of the Atlantic Match Company, which agreement was not communicated, but was concealed from Mr. Synnott by Mr. Cummings, and if the $200,000 which Mr. Cummings was to receive by said private agreement was to be taken out of the cash represented by Eaton, in the presence of Cummings, to be in the treasury of the National Match Company for working capital, then the act of Mr. Cummings was in fraud of the rights of the plaintiff in this case and your verdict should be for him. *Answer:* Affirmed. [6]

Verdict and judgment for plaintiff for $51,168.62. Defendant appealed.

*Errors assigned* were (1–6, 11, 12), above instructions, quoting them.

*Frank P. Prichard*, with him *C. V. D. Joline*, for appellant. —Where the aggregate holdings of all the stockholders in a corporation are purchased by one purchaser, and it is claimed that the sale was a joint one, and that a special bargain by one stockholder to get an additional price for his stock and to give some additional considerations, enures to the benefit of all, the rights of the other stockholders to an accounting for the additional price so received cannot be enforced by separate actions of assumpsit for money had and received: Irwin's Adm. v. Brown, 35 Pa. 331; Cummings v. Synnott, 120 Fed. Repr. 84.

Where in such case, the other stockholders claim that the stockholder receiving the additional price joined with the purchaser in misleading the other stockholders as to the amount of cash remaining in the treasury of the purchaser corporation, the fact that there was such concealment or misleading would not in itself justify an action of assumpsit for money had and received, on the ground of a trust, the remedy in such case being an action on the case for fraud, or a bill to set aside the sale: Cooper v. Cooper, 147 Mass. 370 (17 N. E. Repr. 892); Hopkins v. Beebe, 26 Pa. 85.

Where one of several stockholders uniting in a sale of the aggregate holdings receives an additional price for his stock, but is required as a condition precedent thereto to give other considerations besides his stock, he cannot be compelled in an action for money had and received to account for his additional price without allowance for the additional considerations furnished, and such account cannot be stated in actions of assumpsit by separate juries, in separate suits, by separate stockholders.

Where a written agreement contains apparently mutual covenants and considerations, and one of these covenants is expressed to be for a consideration of one dollar, it is for the court and not the jury to say whether such a covenant is a mutual covenant given in consideration for the others, or is a separate and independent covenant, or a separate consideration of one dollar.

*M. Hampton Todd*, with him *Silas W. Pettit*, for appellee.— There was sufficient evidence before the jury to justify the submission of the question of the fact of agency to them.

Profits made in the course of agency belong to the principal and it matters not how far the conduct of the agent may have been in the particular case: Mechem on Agency, section 469; Smith v. Austin, 4 Brewster, 89; Simons v. Vulcan Oil, etc., Co., 61 Pa. 202; Reeside v. Reeside, 49 Pa. 322; Albright v. Mercer, 14 Pa. Superior Ct. 63; Guthrie v. Hyatt, 1 Harrington, 446; Dodd v. Wakeman, 26 N. J. Eq. 484; LeGendre v. Byrnes, 44 N. J. Eq. 372; Kramer v. Winslow, 130 Pa. 484.

OPINION BY MR. JUSTICE BROWN, March 28, 1904:

The Atlantic Match Company was capitalized at \$2,000,000. The par value of the stock was \$100, and the entire issue of 20,000 shares was owned by three persons, Thomas W. Synnott, Charles H. Graham, the appellee, and John E. Cummings, the appellant. Synnott and Cummings each owned 7,500 shares, or three eighths of the issue, and Graham 5,000 shares, the remaining fourth. An arrangement had been made by these stockholders with four gentlemen who had consented to serve as directors that they should, according to the testimony of the appellant, receive \$110,000 of the stock for their services. Synnott testifies that they were to receive but \$30,000. The figures of Cummings, however, are accepted as correct by Graham in fixing the amount of his claim. Cummings also testifies that Synnott had agreed to give two other persons a certain amount of stock, but we need not consider this in the present controversy. If Synnott failed to keep his promise, the controversy will be between him and those with whom he is alleged to have contracted.

In May or June, 1901, Frederick C. Eaton was introduced by Cummings to Synnott. He was a prospective purchaser of the Atlantic Match Company's plant, representing himself as acting for a number of persons who were about to form a company to be known as the National Match Company. On July 18, 1901, he submitted the following written proposition to Synott:

                                        " July 18th, 1901.
" Mr. THOMAS W. SYNOTT,
      " Philadelphia.
    " Dear Sir :—Confirming our conversation with reference to

the consolidation of the Atlantic Match Co. with the National Match Co. would say that my proposition is this :

"I will take over the entire capital stock of the Atlantic Match Co., giving in exchange therefor, five hundred thousand dollars of Preferred Stock and two hundred and fifty thousand of the Common Stock of the National Match Co.

"Five hundred thousand dollars in cash has been subscribed to stock of the National Match Co. as per terms of subscription agreement.

"This stock has been placed with the leading wholesale grocers in the U. S. from Boston to St. Louis, with the pledge of their business.

"Yours very truly,<br>"F. C. EATON."

On the same day Synnott and Cummings, in the absence of Eaton, discussed this proposition, and, according to the testimony of Synnott, it was agreed between them that Cummings should make a counter-proposition for them, asking for the following in addition to the stock of the National Match Company : $200,000 in cash ; Mr. Cummings and Mr. Synnott to be directors of the National Match Company ; and the contract to be guaranteed by the National Match Company. Synnott then went to the seashore and did not return until the following Tuesday, July 23. On July 19, 1901, the day following Eaton's proposition to Synnott, Eaton and Cummings made and entered into the following agreement, or, rather, memorandum of agreement, as it is styled :

"July 19, 1901.

"Memo. of Agreement between J. E. Cummings of the Atlantic Match Company and F. C. Eaton of the National Match Company. J. E. Cummings agrees to sell the entire capital stock of the Atlantic Match Company to F. C. Eaton upon the following terms :

"Eaton gives in exchange for said stock $500,000.00 of the Preferred Stock of the National Match Company, $250,000.00 of Common Stock of the said Co. and $200,000.00 in cash.

"The Atlantic Match Co. stock is to be delivered to the Stand. Trust Company of New York, who will issue temporary receipt or certificate therefor, which shall be exchanged for a

certificate of stock of National Match Company as soon as issued, as above stated. The Cash payments are to be $20,000.00 upon signing of contract for sale, $80,000.00 on August 5th, and $100,000.00 on September 5th.

" The National Match Co. to guarantee Eaton's purchase. The entire bond issue of the Atlantic Match Co. is to be cancelled.

" Possession is to be given August 1st. Thomas W. Synnott and J. E. Cummings are to be elected Directors of the National Match Co. and J. E. Cummings is to remain in the business employ of National Match Co.

" Correct.

   " F. C. E.

   " J. E. C.

" Approved,

   " Jos. Swift."


On Synnott's return on Tuesday morning, July 23, he went to the office of the match company, and, as he testified, asked Cummings whether he had heard from Eaton, to which reply was made : " Eaton will not pay any cash." He then said : " Well, if he will not pay any cash we must have a million dollars of stock." Synnott then went to see Graham and explained the situation to him, and asked whether they should sell for $750,000 worth of the stock of the National Match Company, if they could do no better. He says that Graham replied : " If you and Cummings think that is the best you can do, then do it and I will be satisfied ; I will be satisfied to do what you do." Synnott reported this to Cummings, and thereupon the following agreement was made :

" This agreement made this 23d day of July, A. D. 1901, between Thomas W. Synnott and J. E. Cummings of the city of Philadelphia, parties of the first part, and F. C. Eaton, of the city of New York, party of the second part, witnesseth :

" Parties of the first part in consideration of the sum of one dollar, to them in hand paid by the party of the second part, do hereby sell, assign and transfer to said second party, the entire capital stock of the Atlantic Match Company a corporation duly organized under the laws of the state of New Jer-

sey, said capital stock consisting of seven hundred and fifty thousand ($750,000) dollars preferred stock and two million ($2,000,000) of common stock.

"The first parties agree that the bond issue of the Atlantic Match Company which has been underwritten, to wit, two hundred and fifty thousand dollars ($250,000) shall be cancelled; party of second part in consideration of the above transfer of said Atlantic Match Company's stock, hereby sells, assigns and transfer to said first parties or their assigns five hundred thousand dollars ($500,000) of preferred stock and two hundred and fifty thousand dollars ($250,000) of common stock of the National Match Company, a corporation duly organized under the laws of the state of New Jersey.

"The parties of the first part agree to deposit said Atlantic Match Company's stock with the Standard Trust Company of New York for account of second party and second party hereby authorizes said Standard Trust Company to give in exchange therefor certificates of stock of the National Match Company, as above provided.

"In witness whereof, the said parties have set their hands the day and year above written.

"(Sgd.)    THOMAS W. SYNNOTT,

"J. E. CUMMINGS,

"F. C. EATON."

Indorsed : " National Match Company has one million ($1,000,000) of preferred six per cent. non-cumulative stock and $1,500,000 of common stock of which $1,000,000 preferred stock and $500,000 of common stock has been subscribed for on terms of subscriber's agreement, leaving one million of common stock for future purposes. . The liabilities of the Atlantic Match Company consisting of notes, etc., to the amount of about ninety-four thousand dollars ($94,000) are to be paid by the National Match Company between date hereof and January 1, 1902, at which time the bonds of the Atlantic Match Company will be cancelled.

"(Signed)    F. C. EATON."

Further indorsed : " The capital stock of the within named Atlantic Match Company, having been reduced from $2,750,000 to $2,000,000 by retiring the $750,000 of its authorized

preferred stock before the actual issue of any thereof, the within agreement is hereby amended by conforming to such fact the within statement of the capitalization of said Company.

" (Signed)    J. E. CUMMINGS,
              " F. C. EATON,
              " THOMAS W. SYNNOTT."

On the same day, July 23, without the knowledge of Synnott or Graham, another agreement was entered into by Eaton and Cummings, of which the following is a copy :

" This agreement made this 23d day of July, A. D. 1901, between J. E. Cummings, of the city of Philadelphia, of the first part, and F. C. Eaton, of the city of New York, of the second part witnesseth :

" Party of the first part in consideration of the sum of two hundred thousand dollars ($200,000) sells, assigns and transfers all his right, title and interest in and to the stock of the Atlantic Match Company a corporation duly organized under the laws of the state of New Jersey, to second party.

" The party of the second part agrees to pay said sum of two hundred thousand dollars ($200,000) in the following manner to first party :

" Twenty thousand dollars ($20,000) on or before July 27 ; eighty thousand dollars ($80,000) on or before August 5, and one hundred thousand dollars ($100,000) on or before September 5.

" Party of the first part covenants and agrees that possession of the Atlantic Match Company's business shall be turned over to second party on the 5th day of August, 1901; party of first part further agrees that in consideration of the sum of one dollar to him in hand paid by the party of the second part, the receipt of which is hereby acknowledged, that second party shall have the option to first party's interest in the property and business of the Safe Harbor Match Company which said property is located at Safe Harbor, Pennsylvania, at the price to be determined by examination of books, said price not to exceed the actual cash paid in the said company. This option to cover a period of six months from date hereof. First party also agrees to use every means to secure balance of Safe Harbor Match Company on terms above set forth.

" The first party also covenants and agrees with second party that during the period of this option second party shall have the entire output of the Safe Harbor factory at factory cost of goods. This contract is made part of contract of even date between Thomas W. Synnott, J. E. Cummings and F. C. Eaton. In witness whereof the parties hereto have set their hands and seals the day and year first above written.

                            " J. E. CUMMINGS,    [L. S.]
                            " F. C. EATON."       [L. S.]

Cummings received the $200,000 in cash stipulated for, first, in the agreement of July 19, and, afterwards, in that of July 23, and the third and last instalment was paid to him on September 5, 1901. Neither Synnott nor Graham, as they testified, knew anything about the agreement to give Cummings the $200,000, nor of the payment of-it to him, until the following October. This proceeding was instituted by Graham to recover from Cummings his proportionate share of it, on the ground that Cummings had received it as the agent for all the stockholders. The claim is for one fourth of the amount received by Cummings less 11/200, or $11,000, which is the amount Cummings may owe the four stockholders who had agreed to serve as directors. The stock of the Atlantic Match Company which they were to receive was never issued to them. They did, however, receive their proportionate shares of the stock of the National Match Company. Deducting from the $200,000 the $11,000 which may be due to these four individuals, the one fourth of the balance is $47,250, the amount of the plaintiff's claim.

The appellant repudiates the claim of the appellee to any portion of the $200,000 for the reason that he had not acted as the agent of the other two stockholders in the negotiations for the sale of the stock to the National Match Company. He insists that he was acting for himself alone and negotiating only for the sale of his stock. The agreement to pay him $200,000 is conceded by him to have been a secret one, so far as Synnott and Graham were concerned, and he contradicts the statement of Synnott that the latter suggested he should ask Eaton for $200,000 in cash in addition to the offer of stock of the National Match Company, that they should be directors in that com-

pany, and that the contract should be guaranteed by it.   His testimony is, that from the beginning to the end of the negotiations, Synnott never said anything about cash.   Without reciting his testimony, corroborated in material matters by Eaton, it is sufficient to say that, if the jury had believed them, there ought to have been a finding that he was not agent for Synnott and Graham in making the sale of the stock, and, under the court's instructions, the verdict ought to have been in his favor.   The verdict having been against him, the finding as to his agency must have been against him, notwithstanding all to which he and Eaton had testified.   They both testified that he had not acted as agent for Synnott and Graham, and, unless the jury found that he had, a verdict could not, under the instructions given, have been returned for the plaintiff.   In his charge the learned trial judge clearly and distinctly stated that it was the right of Cummings to sell his own holdings for whatever price he might be able to get for them, and that, if he acted only in his own behalf and for his own advantage, as he testified, he had a right to retain the $200,000; and the jury were further told that, unless they found he had acted for Synnott and Graham as well as for himself when he procured the promise to pay him the money, which he admittedly received, plaintiff was entitled to no portion of it.   The question of fact became a very narrow one, and that there was ample evidence to justify the finding reached, that the appellant had acted as agent for the appellee and Synnott, is very clear.

After Eaton had submitted his proposition of July 18, 1901, proposing to take the entire capital stock of the Atlantic Match Company and give in exchange therefor $500,000 of the preferred stock and $250,000 of the common stock of the National Match Company, Synnott testified that he and Cummings, in the absence of Eaton, discussed the counter-proposition to be submitted, to the terms of which we have just referred.   Cummings and Synnott then separated, to meet again on the following Tuesday, July 23.   On July 19, the day after Synnott says he and Cummings had discussed the counter-proposition to be submitted to Eaton, Cummings and Eaton met, and the memorandum of agreement, by the terms of which Cummings was to receive $200,000, was initialed by them.   By its terms Cummings agreed to sell, not his, but the entire capital stock of

the Atlantic Match Company, in consideration of $500,000 of the preferred stock of the National Match Company and $250,000 of the common stock and $200,000 in cash in addition—the very sum named by Synnott as the one he and Cummings had agreed they would ask to be paid to them in cash. The further consideration spoken of by Synnott appears, that he and Cummings should be elected directors of the new company. Cummings met Synnott on Tuesday, July 23, but made no mention, as he admits, of the agreement of July 19. If there were nothing more in the case, it is hardly conceivable that Synnott's testimony as to what occurred between him and Cummings on July 18 could be discredited, and, if not, the conclusion would be irresistible that Cummings, on the 19th, had acted not only for himself, but for Synnott and Graham as well. When they met on July 23, Cummings not only said nothing to Synnott about the agreement of July 19, but, according to the testimony of the latter, said Eaton would not pay any cash. Synnott then saw Graham and, having got his authority to act for him, authorized Cummings to make the deal upon the basis of the proposition of July 18, if he could do no better; thereupon the first agreement of July 23, between Eaton, Synnott and Cummings, was executed. On the same day Eaton and Cummings executed the other agreement, admittedly concealed from Synnott, by which Cummings was to be paid $200,000. It is true, in consideration of one dollar, Cummings "further" agreed that Eaton should have the option to purchase the interest of Cummings in the Safe Harbor Match Company, and that, for six months, he should have the entire output of that factory at the factory cost of goods.

Though by the agreement of July 23, between Cummings and Eaton, the former sells his stock for $200,000, by the prior agreement of the same date, between Synnott, Eaton and himself, $750,000 of the capital stock of the National Match Company was to be paid to them, to three eighths of which he would be entitled. As he was thus entitled to his proportionate part of this stock he was admittedly to get, by the separate agreement, $200,000 more than either of the other two. As to the provision in the agreement of July 23, relating to the Safe Harbor Company, the court said, in answer to the twelfth point submitted by the defendant: "If the jury believe that

Mr. Cummings, acting in perfect good faith with the other two gentlemen, and if they believe he, while so acting, gave another consideration which, added to the stock, made it worth $200,000 more than the other two gentlemen got for their stock, then, if that consideration were a valid one, he should have credit for it. If, on the other hand, the jury find that the consideration was simply the transfer of the stock, and that the introduction into the agreement of the Safe Harbor Company was only an invention to cover up a fraudulent transaction, then it can have no bearing upon the verdict which will be found by the jury." Of this the defendant cannot complain, for the court allowed the jury to take into consideration this agreement as to the Safe Harbor Company in determining whether or not Cummings was acting for himself alone or for the other two stockholders. If, as he now contends, the court ought to have passed upon the question whether the agreement as to the Safe Harbor Company was a separate and independent covenant, supported by the separate consideration of $1.00, error would not have been committed, if the court had read the agreement just as it is written—$200,000 in consideration for the stock and $1.00 as the consideration for the covenant as to the Safe Harbor factory. Each receipt given by Cummings for the three instalments of the $200,000 is on account of the contract covering the sale of the Atlantic Match Company, and makes absolutely no reference to anything else. They could well be regarded by the jury as evidence of what the real agreement between the parties was, viz.: that the $200,000 was for the stock alone.

In addition to the evidence to which we have called attention as justifying the finding of the agency of Cummings, there is the testimony of Thomas B. Harned, Esq., who states that Cummings said to him, in speaking of the sale of the stock: " I represented Mr. Graham and Mr. Synnott, and I worked the deal and brought about the arrangement."

In the suit brought by Synnott against Cummings the judgment for the plaintiff, entered on a verdict directed by the circuit court of the United States for the district of New Jersey, was reversed by the divided circuit court of appeals : Cummings v. Synnott, 120 Fed. Rep. 84. DALLAS, J., said, among other things, that while the count in the narr, alleging

that the defendant had received the money as the agent of the plaintiff was sufficient, it did not appear he had done so.    We do not have the record of that case before us and cannot tell what it shows.    We do know, however, that in the present case it does appear from testimony which the jury credited that Cummings had acted as agent for his associates.

In attempting to sustain the fifth and sixth assignments of error, it seems to be assumed by the learned counsel for appellant that plaintiff's cause of action was the misrepresentation by Cummings and Eaton as to the amount of cash that would be in the treasury of the new corporation, and it is, therefore, contended that the plaintiff's remedy, if any, is in an action of deceit for damages sustained, or by a bill in equity to set aside the sale made by Cummings.    The cause of action, as set forth in plaintiff's statement, and as submitted to the jury under the evidence, was the indebtedness of Cummings to the plaintiff for money had and received by him for the use of the latter. On that issue the plaintiff was entitled to recover, if he could sustain his allegation ; if he could not, the money in the hands of Cummings was his own.    But it is further contended that, if the plaintiff was entitled to recover any portion of the $200,000, his remedy is by a bill in equity for an accounting.

" A court of equity's jurisdiction over matters of account is based upon three grounds, viz : the complicated character of the account, the need of a discovery, and the existence of a fiduciary or trust relation : ". 2 Beach on Modern Equity Jurisprudence, p. 902, sec. 839.    Here there is no complicated account.    There is nothing for which the plaintiff must account to the defendant, and there is but a single item in his hands for which he is to account to those owning the fund with him. The only accounting that is involved is unilateral.    No discovery is necessary, for everything is known that the plaintiff needs to know, and there was no such trust relation between Cummings and Synnott and Graham as required an accounting under the decree of a chancellor.    Where accounts are all on one side, and no discovery is sought or needed, courts of equity will not take jurisdiction of the cause : Gloninger v. Hazard, 42 Pa. 389 ; Passyunk Building Association's Appeal, 83 Pa. 441 ; Appeal of Pittsburg & Connellsville R. R. Co., 99 Pa. 177 ; Paton v. Clark, 156 Pa. 49 ; Brightly's Equity, sec. 125.

It is doubtful whether the four parties to whom the $110,000 of stock were to be issued are entitled to any portion of the $200,000 ; but, if they are, plaintiff leaves his proportionate share to pay them in the hands of the defendant.

The question of the waiver by the plaintiff of a tort committed by Cummings against him and Synnott jointly is not involved in this proceeding. It may be that the attachment ought not to have issued, but defendant withdrew his motion to dissolve it, and the case proceeded and was treated by both parties as an action of assumpsit. It is for the recovery of a debt alleged to be due by the defendant to the plaintiff, and the affidavit upon which the attachment issued so states. True, there is an allegation that it had been fraudulently contracted, but, for that reason, assumpsit is no less the appropriate remedy for its collection. The act of 1869, P. L. 8, providing for an attachment, is only for the collection of debts.

The only remaining question is, could this separate action of assumpsit be brought by Graham, one of the stockholders, for the recovery of the money received and retained by Cummings ? The appellant contends that the transaction, if for the benefit of all the stockholders of the corporation, as the plaintiff insists, was a joint transaction for the benefit of all, and that, if Cummings is liable at all, he is liable to account to all the stockholders jointly. If the contract between Cummings, Graham and Synnott, on the one hand, and the purchaser, on the other, was a joint contract, and if one of the terms of that contract had been, in addition to the exchange of stock, the payment of the sum of $200,000 to· Cummings, Graham and Synnott jointly, the obligation of the purchaser to them would have been to them jointly ; but this is not the case. The $200,000 formed no part of the consideration set forth in the contract.· It was paid and received by Cummings alone, who neither promised nor intended to pay any portion of it to any of the other stockholders. If, however, he was acting as their agent in making the sale, he cannot retain what was paid him. " All profits made and advantage gained by the agent in the execution of the agency belong to the principal. And it matters not whether such profit or advantage be the result of the performance or of the violation of the

duty of the agent. If his duty be strictly performed, the resulting profit accrues to the principal as the legitimate consequence of the relation; if profit accrues from his violation of duty, that likewise belongs to the principal, not only because the principal has to assume the responsibility of the transaction, but also because the agent cannot be permitted to derive advantage from his own default. It is only by rigid adherence to this rule that all temptation can be removed from one acting in a fiduciary capacity, to abuse his trust or seek his own advantage in the position which it affords him: " Mechem on Agency, sec. 469. An agent cannot make profits out of his principal in the business of the agency: Simons v. Vulcan Oil, etc., Co., 61 Pa. 202. "There is no doubt where a duty arises out of an implied undertaking to do an act requiring skill or fidelity, that a breach of the duty may be the subject of an action of assumpsit upon the implied promise, or an action upon the special case for the tort: " Reeside v. Reeside, 49 Pa. 322.

The obligation of Cummings to pay any portion of the sum he received to the stockholders was imposed by law, by reason of his position of confidence, and not because of any contract. " A contract is sometimes said to be implied when there is no intention to create a contract, and no agreement of parties, but the law has imposed an obligation, which is enforced as if it were an obligation arising ex contractu. In such a case there is not a contract, and the obligation arises ex lege: " Milford v. Commonwealth, 144 Mass. 64.* There are express, implied and constructive contracts. A constructive contract is where, as here, duty defines it, instead of the contract defining the duty to be performed. Constructive contracts are fictions of law adopted to enforce the legal duties by actions of contract where no proper contract exists, express or implied: Hertzog v. Hertzog, 29 Pa. 465. Here, the duty of Cummings was to pay to his principals what he had received for them. He received the $200,000 not only for Graham and Synnott, but for himself as well. On what principle can it be contended that, after deducting his own share, as he would have a right to do, he owes the balance of it to the other two stockholders

---

* Also reported 10 N. E. Repr. 516 —REPORTER.

jointly? He did not owe the full sum of $200,000 to them jointly, and they could show no joint title to the same; hence they could not join in an action to recover. Just as each one was entitled to receive his proportionate share of the stock given in exchange, so there is the right of each to receive his proportionate share of the money received for his use. The obligation of Cummings being a legal one, growing out of his relation to the several stockholders, who did not own their shares of stock jointly, but severally, and who had not turned jointly over to him their shares of stock and authorized him to sell or exchange them, his duty to account to them for whatever he may have received for them is to them severally, and not jointly. Having discovered no error in this record, we cannot disturb the judgment.

Judgment affirmed.