# Pollock Industries, Inc. v. General Steel Castings Corporation

*Reilly & Pearce* and *James C. Buckley*, for plaintiff.
*Hinkson & Cantlin*, for defendant.

TOAL, J., November 8, 1963.—Plaintiff sued defendant in assumpsit for damages for breach of an alleged oral contract. Plaintiff averred in its complaint that, in September 1959, defendant, through its duly authorized agent, Thomas Ditchfield, orally employed plaintiff to purchase a used boring mill for defendant; that, by custom, brokers charge purchasers 10 percent of the purchase price for such services, and that after plain-

tiff's representative revealed to defendant's agent the fact that Westinghouse had a used boring mill for sale, defendant dispensed with plaintiff's services, dealt directly with Westinghouse and purchased the mill for $100,000.

Defendant's answer to plaintiff's complaint admitted that plaintiff's representative had revealed to defendant the fact that Westinghouse had a used boring mill for sale and that thereafter defendant had dealt directly with Westinghouse and purchased the mill, the price being $80,000. The answer denied the making of the alleged contract for brokerage services; denied that Thomas Ditchfield had any authority to act as defendant's agent in the making of any such contract, and denied the existence of any custom whereby brokers charge purchasers 10 percent of the purchase price, or any other amount, for representing them in the purchase of used machinery.

The issues framed by the complaint and answer were:

(a) Did Thomas Ditchfield orally employ plaintiff to purchase a used boring mill for defendant?

(b) Did Thomas Ditchfield have the authority to bind defendant to such a contract, or, in the alternative, had defendant held him out as having such authority?

(c) Was there a custom, known to defendant, or so well established, general and uniform that defendant may be presumed to have known it, that brokers receive 10 percent of the purchase price, from purchasers, for representing them in the purchase of used machinery?

The case was tried before a court and jury and the jury brought a verdict in, in favor of plaintiff, in the amount of $9,720.

Defendant filed motions for judgment n. o. v. and for a new trial. The matter has been argued before the court en banc, together with written briefs submitted by both sides and is now ready for a decision.

The record indicates that plaintiff is a firm engaged in selling, buying and acting as a broker for large heavy equipment.

The record in this case indicates the following:

In the summer of 1959, Mark Myers, a sales engineer with Pollock Industries called upon General Steel Castings Corporation at its Eddystone plant, first contacting John Scott, the purchasing agent, to see if his firm was interested in buying certain equipment. Mr. Scott turned Myers over to Thomas Ditchfield, superintendent of the Mechanical Department, who, according to Scott, was the man to see with regard to the purchase of large equipment. No business was done between the firms at this time, but, in the course of the contact between Myers of Pollock and Ditchfield of General Steel, Ditchfield advised Myers that General Steel was interested in buying a large boring mill.

Myers reported this to his associates, and the Pollock firm, being specialists in the new and used machinery industry, used the various trade journals and industry contacts at its disposal in an attempt to locate such a boring mill. Pollock, in addition, placed certain advertisements. Sometime later, Myers contacted Ditchfield in an attempt to sell other equipment, which was unsuccessful, but again at the time of this contact, Myers was told by Ditchfield that General Steel was still looking for a large boring mill.

In September 1959, the Pollock firm received a selective list of surplus equipment being offered for sale on the sealed bid arrangement by Westinghouse Electric Corporation in Lester. Under the sealed bid arrangement, any purchaser interested would submit its bid under seal and the machine would be sold to the highest bidder. On this list was a 28-foot Sellers Vertical Boring Mill, serial no. 677. Myers, seeing this, called Ditchfield, described the boring mill as it was listed, asked if General Steel was interested, and, finding that they

were, made arrangements to meet Ditchfield on the following morning to show him the boring mill. Myers made arrangements with Westinghouse for this purpose.

It is admitted by defendant in paragraph 6 of its answer to the complaint that it had no knowledge that this boring mill was available for sale prior to being informed by Pollock.

On the following morning, Myers picked up Ditchfield and two other employes of General Steel, one a technical engineer in the Planning and Engineering Department, and the other the general foreman of the Maintenance Department. The four drove together in Myers' automobile to the Westinghouse plant where they were taken to the site of the boring mill. For more than one-half hour, the General Steel men examined the boring mill as to its size, adaptability, wear, etc., asked questions of Westinghouse employes and Myers' opinion as to the price for which it could be obtained. At the conclusion of the inspection, Ditchfield said to Myers, "We would like to own this boring mill."

Myers then explained to Ditchfield that there were two ways that the matter could be handled:

(a) General Steel would decide how much it would be willing to spend for the boring mill. This figure less ten percent would be submitted by Pollock on behalf of General Steel at the sealed bid for the boring mill.

(b) An attempt would be made to see if Westinghouse would take the boring mill off the sealed bid, and sell it directly to General Steel, in which event, General Steel would pay Pollock a 10 percent commission of the purchase price paid to Westinghouse.

It was decided that an attempt would be made to see if the latter method could be accomplished.

A conference took place at Westinghouse that morning, as a result of which no decision was made by Westinghouse, but it was left that Myers would be informed

of the decision as soon as made by Westinghouse. The four men left Westinghouse in Myers' automobile and returned to the General Steel plant, the matter being left that Myers would contact Ditchfield as soon as he, Myers, heard from Westinghouse.

A few days later, Pollock received a telegram from Westinghouse Electric Corporation advising that the boring mill in question had been taken off the bid. Myers attempted to find out why this was done and never was able to do so. Myers called Ditchfield and advised him of this development.

Sometime later, it came to Myers' attention that General Steel had bought a large boring mill from Westinghouse. He first called a Mr. Kramer, a man with whom he had previous contact at General Steel, and found out that this was true. He then called Mr. Scott, of General Steel, and told him that he had learned that General Steel had purchased the boring mill to which Pollock Industries had introduced them and asked about the commission which was due. Mr. Scott replied that he would look into the matter and contact Pollock Industries. That ended the contact on behalf of Myers with General Steel, and the matter reached the hands of attorneys.

Defendant in its effort to get an n.o.v., directed the court's attention to certain complaints as follows:

(a) *Plaintiff failed to prove the oral contract upon which its claim was bottomed.*

Defendant has made a synopsis of plaintiff's testimony, which we quote verbatim as set forth in defendant's brief:

"Myers, on direct examination, testified with respect to his conversations with Ditchfield as follows: Myers went to General Steel to try to sell a piece of machinery which Pollock Industries had for sale. He did not make the sale but, in the course of a conversation with Ditchfield, the latter told Myers that General Steel would be

interested in buying a large boring mill. Three weeks later Myers again contacted Ditchfield, trying to sell General Steel another piece of equipment. Myers again failed to make a sale but Ditchfield said General Steel was still looking for a large boring mill. Myers told him Pollock Industries would continue to look for one. Sometime later Myers learned that Westinghouse had such a mill for sale. Myers telephoned Ditchfield, described the mill without revealing where it was for sale, but offered to take Ditchfield to inspect it. After they inspected the mill at the Westinghouse plant, Ditchfield told Myers that General Steel would like to own that machine. Myers told Ditchfield there were two ways the thing could be done: General Steel could determine what they were willing to pay and Pollock would submit a bid of that amount less a 10 percent commission; or there might be a possibility of negotiating the sale between the two companies. Ditchfield said he was interested in pursuing the second method. Myers tried to get Westinghouse to remove the mill from the sale at which it was being offered on a sealed bid basis but was unable to induce Westinghouse to do so. Two or three days later Westinghouse took the mill out of the sealed bid sale and when Myers learned this he called Ditchfield and told him the machine had been removed from the sealed bid, that it was "too bad we missed getting this one but I would continue to advertise and try to locate another one for him. And he said 'fine' ".

On cross-examination, Myers testified as follows:

"Q. Now when and where exactly did Mr. Ditchfield tell you, if he did, that you were authorized on behalf of General Steel to negotiate for the purchase of the boring mill?"

"A. I don't think Mr. Ditchfield ever used those words. In the conversation he said we would like to own this machine, when we were standing at the site of the boring mill when we had completed the inspection".

Defendant contends that the above-cited record does not establish that Ditchfield orally contracted with Pollock Industries for the latter to represent General Steel in negotiating with Westinghouse for the purchase of the mill.

The record shows that Ditchfield admitted that he had told Myers that General Steel was looking for a large boring mill. Defendant admitted that it had no knowledge that the boring mill in question was available for sale prior to being informed by Myers on behalf of Pollock Industries. Defendant further admitted purchasing the boring mill from Westinghouse for $80,000. The record shows that the first contact Myers had with General Steel was with Scott, the purchasing agent, with reference to the sale of certain equipment, and Scott turned Myers over to Ditchfield, superintendent of the Mechanical Department, who, according to Scott, was the man to see with regard to the purchase of large equipment. From that time on Myers' dealings were with Ditchfield who, in the course of said dealings, advised Myers that General Steel was interested in buying a large boring mill.

It is against this background that defendant maintains that plaintiff failed to prove an oral contract between Myers of Pollock and Ditchfield of General Steel. This court is of the opinion that sufficient evidence was produced to submit to a jury on this question. See the case of Hertzog v. Hertzog, 29 Pa. 465, 468, where it is said: "Implied contracts, which arise under circumstances which, according to the ordinary course of dealing and the common understanding of men, show a mutual intention to contract." Also see the cases of Thomas v. R. J. Reynolds Tobacco Company, 350 Pa. 262, 266; Colish v. Goldstein, 196 Pa. Superior Ct. 188, 191, 192.

We are of the opinion that Ditchfield contracted with Myers for General Steel. However, defendant says:

(b) *Plaintiff failed to prove that Ditchfield had either actual or apparent authority to bind General Steel to a brokerage contract with Pollock Industries.*

The record shows that Scott was the purchasing agent for General Steel; that Myers contacted Scott and was referred by Scott to Ditchfield, the plant engineer or superintendent, with the statement by Scott that *"Mr. Ditchfield is the man who would make the decision* as to whether or not we can use the large piece of equipment or capital equipment, *and he is the man to see."* (Italics supplied.)

Apparent authority is such authority as a reasonably prudent man, using diligence and discretion in view of the principal's conduct, would naturally suppose the agent to possess: Winter v. Iron City Stamping Co., 51 Pa. Superior Ct. 11; Murphy v. Beverly Hills Realty Corporation, 98 Pa. Superior Ct. 183. Corporations are necessarily required to conduct their business through agents, and they are bound by the acts of their representatives within the apparent scope of the business with which they are entrusted.

We are of the opinion that the question of apparent authority was properly a question for the jury to decide in the case at bar.

The final complaint advanced by defendant in its motion for judgment n. o. v. is as follows:

(c) *Plaintiff failed to prove the alleged custom that used machinery brokers receive a commission from buyers equal to 10 percent of the purchase price.*

There is no validity to the above contention of defendant. Plaintiff produced a witness, David L. Baker, President of the Philadelphia Chapter of the Machinery Dealers National Association, a man who had been engaged in the metropolitan area of Philadelphia in selling and buying of equipment. Mr. Baker testified that in 1959 the customary fee or brokerage commission

charged by machinery dealers representing buyers was 10 percent of the purchase price. He was not cross-examined by counsel for defendant. The motion for judgment n. o. v. must be refused.

Defendant's motion for a new trial raises three matters: (1) The trial judge misconstrued the issues in the case and, therefore, erroneously instructed the jury to the prejudice of defendant; (2) various actions of the trial judge unduly prejudiced the position of defendant in the eyes of the jury, and (3) the trial judge erred in admitting certain testimony offered by plaintiff over objection of counsel for defendant, and in excluding certain testimony sought to be offered by defendant.

With respect to the trial judge misconstruing the issues in the case and, therefore, erroneously instructing the jury to the prejudice of defendant we have carefully examined the entire record in this case and state that the trial judge not only did not misconstrue the issues but rather did carefully and in great detail outline the burden of plaintiff to prove that: (1) Thomas Ditchfield did orally and by conduct employ plaintiff, through plaintiff's representative, Mark Myers, to act on behalf of defendant as a broker; (2) Thomas Ditchfield had the authority to bind defendant to such a contract or in the alternative that defendant held him out as having such authority, and (3) custom of the brokerage business with reference to sale and purchase of large machinery equipment provided a 10 percent brokerage commission based on the purchase price. The record does not, in our opinion, indicate any fundamental error was committed by the trial judge as to the issues involved in the case.

With respect to various actions of the trial judge unduly prejudicing the position of defendant in the eyes of the jury, we are of the opinion that the record indicates that the trial judge, throughout the trial, en-

deavored to act fairly toward both sides. This case was tried hard, by especially competent counsel, on each side and at times the trial judge was compelled to guide the course of the trial with a firm hand. Counsel has gone all out to fine tooth comb the record to establish some fundamental error in this case. We are of the opinion he has failed in this attempt.

With respect to the complaint that the trial judge erred adversely to defendant in his rulings on various proffered testimony, we have examined the entire record in this case and are of the opinion that no fundamental error occurred in this case. It would indeed be a remarkable case where no error occurred, but, in order to grant a new trial, the error complained of must be such as to prejudice defendant's case in the eyes of the jury and thus prevent a just and fair decision being made by the jury. Defendant complains that the trial judge unduly restricted defendant in its cross-examination of Mark Myers concerning the details of his alleged two prior contacts with Ditchfield and also his contacts with Scott, the purchasing agent. We are of the opinion that the trial judge did not abuse his discretion in this regard and that no prejudice resulted against defendant.

Accordingly the following is made:

### Order

And now, November 8, 1963, a motion for judgment n. o. v. and for a new trial having been made on behalf of defendant and, after oral argument before the court en banc, together with the submission of written briefs by both sides and after careful consideration, it is hereby ordered and decreed as follows:

1. That the motion for judgment n. o. v. be and the same is hereby dismissed; and

2. That the motion for a new trial be and the same is hereby dismissed and a new trial is hereby refused; and

3. That judgment be and is hereby rendered on the verdict in favor of Pollock Industries, Inc., and against General Steel Castings Corporation; and

4. Costs to be paid by defendant.

An exception is herewith granted defendant.