## NESTER v. DIAMOND MATCH CO.

(Circuit Court of Appeals, Seventh Circuit.　January 2, 1906.)

No. 1,164.

1. PLEADING—CONCLUSIONS.

An allegation in a declaration that a draft of a contract and letters between the parties constituted a binding contract was a mere conclusion of the pleader, and should be disregarded.

2. CONTRACTS—REQUISITES—EVIDENCE.

Defendant's agent returned the draft of a contract with objections, whereupon plaintiff's agent replied, suggesting modifications, and that defendant should go ahead with the work until the parties should meet and execute the contract. Defendant's agent, however, did not wire or write that he would go ahead with the work as suggested, but stated that he would send the contract signed in a few days which he did not do, after which a new draft of the contract was prepared. *Held*, that such facts did not show the making of a contract on the basis of the old draft and the letters.

3. LOGS AND LOGGING—BOOMS—CONTRACTS—BREACH.

In an action for alleged breach of defendant's contract to boom plaintiff's logs, certain counts in plaintiff's declaration alleged that defendant did not run, sort, and deliver the logs to plaintiff with reasonable dispatch and care, and also charged that defendant monopolized the entire channel of a river above where he had built its jam piers and sorting gaps for a distance of 10 miles and only permitted such logs to come down as were sufficient to keep its mills in operation, and that large quantities of plaintiff's logs were kept in the river from year to year until the defendant's logs had been sawed and plaintiff's logs had become sap-rotten, worm-eaten, etc. *Held*, that such allegations sufficiently showed a breach of defendant's covenant to properly boom and sort plaintiff's logs.

4. SAME—CONSIDERATION.

Plaintiffs' surrender to defendant of their legal privilege of running and controlling their own logs in the river was an ample consideration for defendant's covenant to boom and sort plaintiffs' logs.

5. SAME—DEFENSES—IMPOSSIBILITY OF PERFORMANCE.

Where defendant's failure to boom plaintiffs' logs as agreed lay not in their failure to put the logs into the boom below the sorting gaps, but in their failure to run the logs down the river to where they could be put into the boom, which failure was due to defendant's use of the river above such sorting gaps as a storage pond for its own logs instead of maintaining the river as a navigable waterway, it was no defense that the boom was of insufficient capacity to contain the logs which plaintiff placed in the river.

6. FRAUDS, STATUTE OF—CONTRACTS—PERFORMANCE WITHIN YEAR.

Where defendant contracted to receive, run, sort, and deliver to plaintiff their logs placed in a river continuously so long as defendant controlled, managed, and operated the river, such contract was not within the statute of frauds as a contract not to be performed within a year.

In Error to the Circuit Court of the United States for the Northern Division of the Northern District of Illinois.

The writ of error is addressed to a judgment entered on the election of plaintiffs in error to stand by their declaration, in three counts, to each of which a general demurrer was sustained.

The first count declared on a written contract; the second, on a contract, unwritten, but completed by the parties' oral acceptance of mutual proposals.

or by their tacit acceptance of mutual proposals implied from their dealings; and the third, on a quasi contract, that is, on circumstances from which the law constructs reciprocal duties, for the breach of which an action may be maintained as if a contract existed.

The Ontonagon river in Upper Michigan is a navigable waterway. For some years prior to 1891 these parties and others had been using the river for the floatage of logs, which were thrown in indiscriminately and came down in a common mass. Near the mouth of the river it was necessary to maintain jam piers and booms, with sorting gaps, to arrest the mass and separate the logs according to ownership. Each count of the declaration is bottomed on defendant's alleged contract obligation, assumed or incurred in 1891, to take charge of plaintiffs' logs, separate them from the mass, and deliver them to the plaintiffs with reasonable dispatch and care, and on defendant's alleged breach of that obligation. Further facts, necessary to the decision, are stated in the opinion.

Timothy E. Tarsney and Burton Hanchett, for plaintiff in error.

Edwin Walker, for defendant in error.

Before BAKER and SEAMAN, Circuit Judges, and HUMPHREY, District Judge.

BAKER, Circuit Judge, after stating the facts as above, delivered the opinion of the court.

1. Plaintiffs take the position that the alleged written contract is a lease of real estate, in which the services stated to be rendered by defendant stand as rent. On that basis, the writing, which was signed by plaintiffs, but not by defendant, would be mutually binding it it was accepted by defendant as a correct expression of the agreements at which the parties had arrived.

The count sets out the paper that was signed by plaintiffs; alleges that it was sent by mail to defendant; that defendant, after receiving it, wrote plaintiffs a letter (which, as well as the others mentioned later, was copied into the count); that plaintiffs thereupon sent an answer; and that defendant afterwards sent plaintiffs another letter. "And the plaintiffs aver that the said draft of contract aforesaid, with the said letters aforesaid, made and constituted a valid and binding contract between the said plaintiffs and the said defendant, according to the tenor and effect thereof; and that the said defendant then and there accepted said contract, and for a long period of time thereafter, to wit, eight years, acted thereunder, recognizing the same as in full force and effect."

The allegation that the draft of contract and the letters constituted a binding contract is the pleader's conclusion of law and must be disregarded. The draft and the letters can speak for themselves on that.

The general averment that defendant accepted and acted under "said contract," consisting of the draft and the letters, might prevail if it were not overborne by the facts specifically set forth.

After defendant received the draft of contract, Barber, president, and Comstock, manager, wrote plaintiffs letters containing objections that fill three pages of the printed record, and returned the draft.

Marston, agent of plaintiffs, on April 15th, sent Comstock a long letter in respect to the objections that had been raised, but did not return the draft of contract. He concluded his letter thus:

"I think I have touched upon all the questions mentioned in yours. Now as it would be very difficult for me here (at Detroit) to describe the boom, etc., I suggest that this letter explains quite fully the contract as we apparently both desire it, that you go on with your work as though the changes were made. I fully expect to be in Ontonagon (where was defendant's mill which Comstock managed) not later than June 15th, and we can then together redraft the contract in view of the additional knowledge we will then possess. I thank you for your kind wishes as to my health. I am improving daily, and it now looks as though I would be able to get South the latter part of this or the early part of next week, much too soon to get new contract signed and approved by all (the plaintiffs). I wish upon receipt of this that you would wire me that you will go ahead until I return and see you."

The next and last letter in the chain was sent on July 27th by Comstock, at Ontonagon, to plaintiffs, at Detroit:

"The writer was in Chicago a few days since and saw Mr. Barber and Mr. Graces (executive officers of defendant), both of whom approved of the contract as prepared during the last visit of Judge Marston to this place. I will in a day or two send it to you signed."

It is clear that Comstock neither wired nor wrote that defendant would go ahead on the strength of Marston's letter in answer to defendant's objections to the draft of contract; but that, on the contrary, he preferred to and did await Marston's return, when they could "together redraft the contract in view of the additional knowledge (they would) then possess"; that a new draft was in fact prepared; and that it alone was accepted by defendant as a correct expression of its obligations. The demurrer to the first count was properly sustained.

2. Though there is a difference in legal conception between the second and third counts (see Woods v. Ayres, 39 Mich. 345, 33 Am. Rep. 396; Sceva v. True, 53 N. H. 627; People v. Speir, 77 N. Y. 144; Hertzog v. Hertzog, 29 Pa. 465), the facts are set forth so similarly that these counts may be considered together, particularly as the same grounds of objection are urged against each.

Without reciting the counts, it is enough to say that we have been unable to find any objections beyond those presented by defendant in support of the ruling on demurrer.

(a) The counts aver that at the beginning of the period when defendant undertook to handle plaintiffs' logs, defendant built and throughout the period maintained, along plaintiffs' water frontage and with plaintiffs' consent, "a certain storage boom, with a capacity sufficient to accommodate 10,000,000 feet of saw logs, especially and particularly for the storing of plaintiffs' logs, to be run, sorted and driven by defendant through the space in said river so controlled, managed and operated by it as aforesaid."

Defendant's promise was that from the beginning of the period "it would continuously, so long as it controlled, managed and operated said river as aforesaid, receive into the part of the river so controlled, managed and operated by it, all of plaintiffs' logs, and run and sort the same for plaintiffs through and in said portion of said river aforesaid, and deliver the same to plaintiffs into said storage boom by it especially built for the storing of plaintiffs' logs as aforesaid, with all reasonable dispatch and care."

The point is made that the allegations of breach of the foregoing covenants are mere conclusions of law and tender no issuable facts; and in support thereof the counts are quoted as follows:

"That defendant did not run, sort and deliver to plaintiffs said logs with reasonable dispatch and care."

If that were the whole of the assignment of breach, the contention would have to be examined. 1 Chitty. Pl. p. 282; Alabama v. Burr, 115 U. S. 426, 6 Sup. Ct. 81, 29 L. Ed. 435.

But the counts show that large quantities of plaintiffs' logs were detained above the sorting gaps from one to eight years, when the running season was only from April to November; and then continue:

"And plaintiffs aver that said defendant monopolized, appropriated and used the entire channel of said river above the point therein where it had built said jam-piers and sorting gaps, for a distance of 10 miles above said point, as a storage pond or boom for the accommodation of its saw logs, and only permitted saw logs to come down through said sorting gaps in quantities sufficient to keep its said mills in operation; that the capacity of said mills was inadequate to saw all of the logs owned by defendant from year to year in said river as they would naturally come down to said sorting gap; that large quantities of defendant's logs accumulated above said sorting gaps, and large quantities of plaintiffs' logs were kept by defendant in said river until the said large quantities of defendant's logs had been sawed into lumber at defendant's mills."

Whereby 150,000,000 feet of plaintiffs' logs became sap-rotten, worm-eaten, etc., to plaintiffs' damage. These averments take defendant's contention out of the range of debate.

(b) Want of consideration is urged. The counts declare that, in return for defendant's obligations, plaintiffs surrendered to defendant their legal privilege of running and controlling their own logs on a basis of equal right with defendant. This was ample.

(c) Defendant says that performance was physically impossible and therefore excused. The basis is this: Plaintiffs put 30,000,000 feet into the river each season; defendant only promised to deliver the logs below the sorting gaps "into the boom built for plaintiffs, which had a capacity of 10,000,000"; and 30 will not go into 10. Of course plaintiffs during the season from April to November could receive 30,000,000 feet in a boom that had the capacity of storing only 10,000,000 at a time. The counts aver that the boom was not the ultimate destination of plaintiffs' logs. If the promise to deliver into the boom were the part of defendant's obligations to which the allegations of breach were directed, the presumptions which are indulged against a pleading might free the defendant from fault. But the counts, as herein above quoted, make it clear that the fault lay, not in failing to put the logs into the boom below the sorting gaps, but in failing to run the logs down the river to a point where they could be put into the boom; and that this was due to defendant's use of the river above the sorting gaps as a storage pond for its own logs, instead of maintaining the river as a navigable waterway.

(d) The statute of frauds. Defendant's obligation being to receive, run, sort and deliver to plaintiffs their logs "continuously, so long as defendant controlled, managed, and operated said river as

aforesaid," and defendant being at liberty to give up the control and management at will, the contract is not within the statute which provides that every agreement, not in writing, shall be void if, by its terms, it is not to be performed within one year. "The parties may well have expected that the contract would continue in force for more than one year. It may have been very improbable that it would not do so; and it did, in fact, continue in force for a much longer time. But they made no stipulation which by terms or reasonable inference required that result. * * * The complete performance of the contract depending upon a contingency which might happen within the year, the contract was not within the statute." Warner v. Texas, etc., Railway Co., 164 U. S. 418, 17 Sup. Ct. 147, 41 L. Ed. 495, and cases therein reviewed.

The judgment is reversed, with the direction to overrule the demurrer to the second and third counts.